**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| GOOSE CREEK PHYSICAL MEDICINE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | No. 2:22-cv-03932-DCN |
| vs. | ) ) | **ORDER** |
| XAVIER BECERRA, *in his official capacity as Secretary, United States Department of Health and Human Services*, | ) ) ) ) | |
| Defendant. | ) ) | |

The following matter is before the court on plaintiff Goose Creek Physical Medicine, LLC's ("GCPM") motion for sanctions, ECF No. 53. For the reasons set forth below, the court grants the motion.

## I.  BACKGROUND

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., commonly known as the Medicare Act, established a system of medically funded health insurance for elderly and disabled persons.[1]  Under the Medicare Act, certain healthcare providers are eligible for reimbursement by the Department of Health and Human Services ("HHS") for services furnished to the Medicare beneficiaries.  To promote the integrity of the Medicare program, the Secretary of HHS is authorized to enter into contracts with private entities to review claims for reimbursement submitted by providers; to determine whether Medicare payments should not be, or should not have been, made; and to recoup

---

[1] The court notes that the remaining facts included in this section are drawn from the amended complaint unless otherwise specified, and therefore, the court omits citations throughout.  See ECF No. 24, Amend. Compl.

1

payments that should not have been made.  See 42 U.S.C. § 1395ddd; 42 C.F.R.
§ 405.371(a)(3).

As this court noted in its most recent order in this case, ECF No. 43, there is an
avalanche of acronyms included within the amended complaint and subsequent briefs.
Therefore, the court finds it helpful to define the most salient acronyms and to review the
Medicare claims appeal process, despite the apparent redundancy with its previous order.
In so doing, the court attempts to summarize the Medicare claim appeal process that
precedes the filing of a complaint in federal court, before turning to the facts of the
operative complaint.

There are several levels of agency review before judicial review of a Medicare
denial.  First, the Centers for Medicare and Medicaid Services ("CMS"), an agency of
HHS, administers the Medicare program and directs its contractors, who are responsible
for the first two levels of administrative review of Medicare denials.  Second, CMS
contracts with Medicare Administrative Contractors ("MACs") to process and audit
claims that have been submitted by Medicare providers in a specific geographic area of
the country.  MACs handle provider and supplier enrollment, as well as redeterminations,
which form the first level of the Medicare claims appeal process.  Third, until 2016, Zone
Program Integrity Contractors ("ZPICs") audited the payment decisions made by MACs
in a process referred to as a "post-payment review," which identified both overpayments
and underpayments.  In fiscal year 2016, CMS began transitioning from ZPICs to Unified
Program Integrity Contractors ("UPICs"), which now perform similar duties to what
ZPICs previously performed.

Fourth, CMS is mandated to enter into contracts with qualified independent contractors ("QICs") to conduct reconsiderations of redetermination decisions. The QICs are statutorily required to be independent of any MAC, ZPIC, or UPIC, as the QICs form the second level of the Medicare claims appeal process. The Office of Medicare Hearings and Appeals ("OMHA") is responsible for the third level of the Medicare claims appeal process—whereby a reconsideration decision by the QIC is reviewed by an OMHA adjudicator—and the appellant Medicare provider may request an administrative law judge ("ALJ") hearing. When a party is dissatisfied with the ALJ's decision, that party may appeal the decision to the Medicare Appeals Council (the "Council"), and the Council is statutorily authorized to review the ALJ's decision. The Council is located within the Departmental Appeals Board ("DAB") of HHS and provides the fourth level of administrative review. The fifth level of appeal is judicial review in a federal district court.

The CMS contractors evaluate overpayments to Medicare providers and suppliers through statistical sampling and extrapolation. CMS Ruling 86-1 was the first ruling that allowed a fiscal intermediary—such as a MAC, ZPIC, or QIC—to use sampling and extrapolation instead of claim-by-claim review. Chapter 8, Section 4, of the Medicare Program Integrity Manual ("MPIM") provides detailed requirements for CMS contractors to follow in developing an audit plan and executing the sampling and extrapolation process. Ctrs. for Medicare & Medicaid Servs., Pub. 100-8, MPIM § 8.[2] Under section

---

[2] The court notes that the cited Chapter 8 of the MPIM in effect at the time of the underlying analysis has been archived within the agency's website but is available at the following link. Ctrs. for Medicare & Medicaid Servs., Pub. 100-8, MPIM § 8 (enacted May 27, 2011), https://perma.cc/MU2A-F4XC. When the court cites to the MPIM

8.4.1.3 of the MPIM applicable during the statistical sampling and extrapolation at issue, the six mandatory steps were:

(1) Selecting the provider or supplier;
(2) Selecting the period to be reviewed;
(3) Defining the universe, the sampling unit, and the sampling frame;
(4) Designing the sampling plan and selecting the sample;
(5) Reviewing each of the sampling units and determining if there was an overpayment or an underpayment; and, as applicable,
(6) Estimating the overpayment.

Id. § 8.4.1.3; see also Amend. Compl. ¶ 169. At the time of the underlying analysis, the MPIM defined the "universe" and the "sampling frame" to "usually cover all relevant claims or line items for the period under review." MPIM § 8.4.3.2. For purposes of extrapolation, the "target universe" of a provider's Medicare claims consists of "fully and partially adjudicated claims obtained from the shared system" submitted by the provider within the chosen time period. Id. § 8.4.3.2.1.

Once the "sampling unit"[3] is selected, the relevant limiting criteria are applied to the target universe, and the resulting set of sampling unit data is called the "sampling frame."[4] The contractor then takes a random selection of the

---

throughout this order, it is citing to the MPIM adopted on May 27, 2011, which was still in effect at the time of the sampling and extrapolation at issue.

[3] The sampling unit is the information that the contractor wishes to measure. The operative MPIM for this case indicates that its summary assumes that the sampling unit is the claim, although this is not required. MPIM § 8.4.3.2. The sampling unit may also be "a cluster of claims, as, for example, the patient, a treatment 'day', or any other sampling unit appropriate for the issue under review." Id. "Sampling units are the elements that are selected according to the design of the survey and the chosen method of statistical sampling." Id. § 8.4.3.2.2.

[4] "The sampling frame is the 'listing' of all the possible sampling units from which the sample is selected." MPIM § 8.4.3.2.3. "The ideal frame is a list that covers the target universe completely." Id.

4

claims in the sampling frame and the contractor's medical review staff audits each claim in that sample to determine whether the claim was properly paid, overpaid, underpaid, or improperly denied payment.[5]  See generally MPIM § 8.4.4.  Upon completion of review of the claims sampled from the "sampling frame," the contractor calculates the net average amount by which the provider was incorrectly paid for the sampled claims.  In cases where the provider was initially overpaid, the net overpayment identified in the sample is then projected to the sampling frame of that provider's claims to form the extrapolated overpayment amount.  This process requires the contractor to accurately assess underpayments as well as overpayments, including claims that were unpaid after adjudication ("zero-paid claims")[6] to ensure the actual net overpayment is correctly calculated.  Should a contractor seek to recover an overpayment from a provider, it should include information about the review and statistical sampling methodology that was followed in the overpayment demand letter.

GCPM is a South Carolina limited liability company and a former for-profit provider of physical medicine services, including chiropractic services, which was enrolled as a provider of services in the Medicare program.[7]  GCPM filed a complaint for judicial review against defendant Xavier Becerra (the "Secretary" or "Secretary

---

[5] At the hearing, GCPM defined the sample taken from the sampling frame as the "sampling set."  ECF No. 65.  In the interests of clarity, the court will simply refer to it as the sample from the sampling frame.

[6] Zero-paid claims, which are claims that were unpaid after adjudication, are distinguishable from unpaid claims, which are claims that have been submitted for payment but have not yet been adjudicated or processed for payment determination.

[7] As of September 2017, GCPM's clinic ceased operations.  However, GCPM's limited liability company remains in existence and is in good standing with the state of South Carolina.

Becerra"), in his official capacity as the Secretary of HHS.  It alleges violations of law in the design and execution of the statistical sampling and the calculation of the alleged overpayment amount, plus interest, on claims GCPM submitted to Medicare.  It also alleges improper accounting on payments made on the alleged overpayment.  The relevant period is for dates of service between March 5, 2011, and November 30, 2013.

GCPM purportedly failed an audit performed by CMS's designated ZPIC: NCI AdvanceMed ("AdvanceMed").  AdvanceMed opened an investigation into GCPM's claims based on data analysis that GCPM's top-billed code, other than for evaluation and management services, was for CPT[8] 64450, a nerve block procedure.  On October 14, 2014, AdvanceMed sent GCPM its Post-Payment Review Results and Overpayment Extrapolation Report ("OER") containing the results of its completed audit.  The report identified that AdvanceMed used a form of stratified statistical sampling to select 67 claims and 210 CPT line items from a total 2,979 claims and/or line items.[9] AdvanceMed explained that it initially identified an error rate of 89.5%; however, it voided sixteen zero-paid claim lines, "as they constitute no loss to the Medicare Trust Fund," which ultimately increased the error rate to 94%.[10]  Amend. Compl. ¶ 207.

---

[8] The current procedural terminology ("CPT") codes offer doctors and health care professionals a uniform language for coding medical services and procedures.

[9] Somewhat confusingly, CMS uses the language "sampling units" to identify the claims included in the target universe; but also uses the terminology "sampling unit" to define the criteria employed to identify the sampling frame from the target universe.  See, e.g., MPIM § 8.4.3.2.2; supra n.3.  To avoid this confusion, the court will simply refer to the "sampling units" by identifying them as the claims and/or line items included in the target universe.

[10] At the hearing, GCPM clarified that the voiding of the zero-paid claims occurred when AdvanceMed generated the sampling frame by applying the sampling unit to the target universe.  ECF No. 65.  Consequently, the subsequent randomly generated sampling set was devoid of all zero-paid claims.  Id.  The Secretary's position at that

"AdvanceMed then extrapolated the 94% error rate across the frame of 'all codes billed' from the Review Period," to determine an overpayment amount of $337,693.09. Amend. Compl. ¶ 208 (citing Admin. R. 1 at 521). AdvanceMed purportedly sent GPCM an encrypted CD as well as the OER, but the information provided "did not contain the actual universe of claims on which the overpayment was determined." Id. ¶ 210. On November 26, 2014, CMS's designated MAC for South Carolina, Palmetto GBA, LLC ("Palmetto"), formally issued a demand for repayment in the amount of $337,693.09.

Four levels of administrative review have since followed, through which GCPM challenged the validity of AdvanceMed's sampling and extrapolation conducted during the audit. First, on January 9, 2015, GCPM timely submitted a request for redetermination to the MAC. On February 13, 2015, Palmetto issued a fully unfavorable redetermination decision that confirmed the overpayment to be $343,744.24, which included the original, alleged overpayment amount plus interest. Second, on April 13, 2015, GCPM timely submitted a request for reconsideration to the QIC in response to Palmetto's unfavorable redetermination. On June 12, 2015, the reviewing QIC, C2C Solutions, Inc. ("C2C"), issued an unfavorable reconsideration decision identified as Medicare Appeal Number 1-3125869890. As of August 5, 2015, GCPM had repaid Palmetto the entire alleged overpayment amount of $355,844.92, which included the alleged overpayment amount plus interest.

Third, on August 5, 2015, GCPM timely filed a request for hearing by an ALJ with OMHA to appeal C2C's unfavorable reconsideration decision. Six years later, on

---

hearing was that the sought "universe" is essentially what GCPM refers to as the sampling frame. See id.

7

December 9, 2021, ALJ Dean Yanohira of the Phoenix Field Office held a telephonic hearing and on January 18, 2021, ALJ Yanohira issued a partially favorable notice of decision (the "ALJ Decision"). The ALJ Decision found the statistical sampling and extrapolation of overpayment to be valid but ordered that the overpayment amount be recalculated in light of AdvanceMed's removal of sixteen zero-paid claim lines, which had increased the error rate from 89.5% to 94%. Consequently, the ALJ Decision reduced the overpayment amount to $280,018.10 and ordered that a refund totaling $60,775.79 be issued to GCPM. Fourth, on March 14, 2022, GCPM filed a Medicare Appeals Council Review Request with the Council requesting review of the ALJ Decision. GCPM specifically requested that the Council both "renew" the ALJ Decision requiring C2C to recalculate the overpayment amount and reverse the ALJ Decision regarding the validity of the sampling and extrapolation. Amend. Compl. ¶ 248.

Fifth, on June 21, 2022, GCPM electronically filed a letter with the Council, which requested escalation to federal district court if the Council was unable to timely issue a decision. On June 30, 2022, after the Council failed to timely respond within the required five-day timeframe,[11] GCPM electronically filed its final letter with the Council stating its intent to escalate the matter to federal court by August 26, 2022, in accordance with 42 C.F.R. § 405.1132(a). On August 25, 2022, the Council issued a Notice and Order of Medical Appeals Council Granting Request for Escalation. This lawsuit followed.

---

[11] It is interesting that while it took six years to schedule a hearing, the regulations require the Council to issue a decision in five days. Alas, ours is "not to reason why." Lord Alfred Tennyson, Charge of the Light Brigade (c. 1895).

On August 19, 2022, GCPM filed its complaint in the United States District Court for the District of Columbia. ECF No. 1. On October 19, 2022, that court transferred the action to the United States District Court for the District of South Carolina by consent of the parties.[12] ECF No. 11. On March 24, 2023, GCPM filed an amended complaint, now the operative complaint, against the Secretary to allege multiple violations of GCPM's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, as well as violation of the Social Security Act, 42 U.S.C. § 1395 et seq.,[13] and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. ECF No. 24, Amend. Compl.

On March 13, 2023, GCPM filed objections to the administrative record and moved to compel completion of the administrative record. ECF No. 18. On May 17, 2024, the court granted GCPM's motion to compel completion of the administrative record, ECF No. 18, and granted Secretary Becerra's motion for protective order, ECF No. 30. ECF No. 43. On May 17, 2024, GCPM filed a motion for sanctions based on Secretary Becerra's purported failure to comply with the court's grant of GCPM's motion

---

[12] The parties agreed to transfer the case from the District Court for the District of Columbia to the District of South Carolina upon the parties' consent that venue is proper in GCPM's judicial district. ECF No. 10-1 (citing 42 U.S.C. § 405(g)). As such, the appropriate venue is the district in which the plaintiff resides or has his principal place of business. Id. GCPM's principal place of business is in the District of South Carolina and therefore the District of South Carolina is the appropriate venue for this action. Id. When a transfer is made from an improper venue to a proper one, the district court receiving the case must apply the law of the state in which it is held rather than the law of the transferor district court. 28 U.S.C. § 1406(a); Myelle v. Am. Cyanamid Co., 57 F.3d 411, 413 (4th Cir. 1995). As such, the court applies the law of this district and of the Fourth Circuit.

[13] GCPM stipulates that this court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. § 1395ff, which authorizes judicial review of a final agency decision of the Secretary.

9

to compel.  ECF No. 53.  On June 7, 2024, Secretary Becerra responded in opposition, ECF No. 57, to which GCPM replied on June 14, 2024, ECF No. 62.  On July 18, 2024, the court held a hearing on the motion for sanctions.  ECF No. 65.  As such, the motion has been fully briefed and is now ripe for review.

## II.  STANDARD

Federal Rule of Civil Procedure 37 permits the district court to enter orders compelling discovery and to impose an array of sanctions for the failure to comply with such orders.  Fed. R. Civ. P. 37(b)(2)(A).  Rule 37(b)(2)(A) governs the appropriate sanctions for failure to obey a discovery order, stating in pertinent part:

> If a party . . . fails to obey an order to provide or permit discovery . . . the court . . . may issue further just orders . . . [including] . . . dismissing the action or proceeding in whole or in part; rendering a default judgment against the disobedient party; or treating as contempt of court the failure to obey any order.

Fed. R. Civ. P. 37(b)(2)(A).

When  a district court exercises its discretion to select sanctions appropriate to the particular violation, it should consider four factors:

> (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions.

McKenna v. Sovran Bank NA, 836 F.2d 546 (4th Cir. 1987) (unpublished table decision) (internal citations omitted).  "A district court must consider all of these factors; however, no one factor is dispositive."  Ashmore v. Allied Energy, Inc., 2016 WL 2898007, at *3 (D.S.C. May 18, 2016) (quoting Elmore v. City of Greenwood, 2015 WL 3868068, at *7 (D.S.C. June 23, 2015) (internal quotation marks and citations omitted)).

Only in limited circumstances are the drastic sanctions of dismissal and default appropriate—namely, "where the noncomplying party's conduct represents such flagrant bad faith and callous disregard for his obligations under the Rules that the sanctions are warranted not merely to prevent prejudice to his current adversary, but also to deter those who might be tempted, in the future, to engage in similar misconduct." McKenna, 836 F.2d 546. "Nevertheless, in considering what sanctions are appropriate, the court must focus on determining a sanction that fits the case at hand, considering the potential harm to the party seeking discovery and the conduct of the non-producing party." Taylor v. Specialty Mktg., Inc., 985 F.2d 553 (4th Cir. Feb. 2, 1993) (unpublished table opinion).

### III.  DISCUSSION

At the outset, the court finds it necessary to review its order resolving GCPM's motion to compel, which underlies the request for sanctions, prior to delving into the parties' arguments for and against sanctions.  In that order, the court first noted the general rule that claims brought pursuant to the APA must be based on an existing administrative record and further found that Section 706 of the APA commands the reviewing court to review the whole record.  See ECF No. 43 at 21.  The administrative record is incomplete if it fails to provide a court with all the documents, memoranda, and other evidence that the agency directly or indirectly considered.  Id.  Courts must apply the "presumption of regularity"—i.e., the presumption that public officers have properly discharged their official duties—absent clear evidence that those duties were improperly discharged.  See United States v. Chem. Found., 272 U.S. 1, 14–15 (1926).  "A party seeking to 'complete' the record may overcome [the] presumption [of regularity] with 'clear evidence' that the documents it seeks to add were considered by agency

11

decisionmakers." Id. at 23 (quoting S.C. Coastal Conservation League v. Ross, 431 F.

Supp. 3d 719, 723 (D.S.C. 2020)); see also Tafas v. Dudas, 530 F. Supp. 2d 786, 795

(E.D. Va. 2008) (explaining that clear evidence may be demonstrated by a strong,

substantial, or prima facie showing that the record is incomplete).

    The court granted GCPM's request to compel Secretary Becerra to complete the

administrative record. ECF No. 43 at 25. GCPM identified that there were five files

missing from the record before the court: (1) GCPM's Freedom of Information Act

("FOIA") request, (2) the Universe File, (3) the Adjusted OP File, (4) the Missing

Universe File, and (5) the Adjusted OP File Calculations.[14] Id. at 14–17, 24. Through

GCPM's FOIA request, GCPM—and subsequently the court—received the Universe File

and the Adjusted OP File, which it thereafter incorporated into the administrative record.

Id. The court ordered the Secretary to produce the Missing Universe File and the

Adjusted OP File Calculations within forty-five (45) days. Id. The court filed the order

on March 5, 2024, meaning the Secretary had until May 7, 2024, to timely produce those

---

[14] In the interests of completeness, the court summarizes each of these documents.
First, GCPM's FOIA request was a FOIA request that GCPM sent to CMS requesting
specific documents related to GCPM and the request for records dated January 14, 2014.
ECF No. 43 at 13. While that would normally not be included in the administrative
record, the court included it to explain how GCPM received the Universe File and
Adjusted OP File. Id. at 25 n.15. Second, the Universe File is identified as "Attachment
B – Universe.xlsx" which was a statistical methodology document that listed the fully
and partially paid claim lines, but which omitted all zero-paid claims. Id. at 14. Third,
the Missing Universe File is the document that includes the omitted zero-paid claims—
thus, it would include all claims from the review period included in the target universe,
not just the claim lines for the sampling frame. Id. Fourth, the Adjusted OP File is
identified as "AdjustedOPAfterALJ.xlsx" which is a spreadsheet that purports to support
Palmetto's recalculation of the overpayment amount, though it does not show the
statistical analysis and related calculations that Palmetto used to reach the $60,775.79
repayment figure. Id. at 15. Fifth, the Adjusted OP File Calculations is the file that in
fact demonstrates Palmetto's statistical analysis and related calculations. Id.

files.  ECF No. 43.  On April 19, 2024, the Secretary filed his production.  ECF No. 51.

On May 15–16, 2024, GCPM conferred with the Secretary regarding deficiencies in the

Secretary's production regarding the Missing Universe file.  ECF No. 53 at 3.

On May 17, 2024, fifty-five days after the court issued its order, GCPM filed a

motion for sanctions.  ECF No. 53.  It argues that the Secretary's production fails to

include the complete universe of claims because the produced file

"Supp_003_Attachment B-Universe.xlxs" ("Supplemental Universe File")—described as

"a copy of the claim-line detail of the sampling frame"—still lacks all the zero-paid

claims.  Id. at 1–2.  In essence, GCPM details that the Supplemental Universe File is

merely another copy of the Universe File, and GCPM notes that it already had this file,

albeit in a different file format.  Id. at 2–3.  GCPM notes the Secretary's assertion that the

Supplemental Universe File is "the sole universe file created by AdvanceMed . . . .  There

is no other file."  Id. at 3 (citing ECF No. 51 at 2).  However, GCPM believes the

Secretary's assertion is unpersuasive because AdvanceMed previously "admitted that it

had possession of the target universe when it removed zero-paid claims to create [the

Universe File], which inflated the error rate from 89.5% to 94%," which subsequently

prompted the overpayment extrapolation.  Id.  In short, GCPM claims that "[Secretary

Becerra] failed to preserve and produce the target universe, despite the Court's Order."

Id.  GCPM requests the court sanction the Secretary "in the manner it deems appropriate"

and suggests the minimal sanction of designating the Secretary's failure to preserve and

produce the target universe as an established fact for purposes of adjudicating the

summary judgment motions.  Id.

In response, the Secretary argues that GCPM "has not identified any failure on the part of the Secretary." ECF No. 57 at 1. To comply with this court's order, the Secretary directed Chief Statistician Robert D'Zio ("D'Zio"), as the Medicare program integrity contractor[15] who presently maintains the materials generated during the GCPM post-payment audit, "to search every file in the program integrity contractor's possession regarding this audit." Id. at 2; see also ECF No. 57-1, D'Zio Decl. He "searched every file and folder" and detailed that he "located no universe file other than the [Supplemental Universe File]." ECF No. 57 at 2. The Secretary argues that the Missing Universe File cannot exist and that the suggestion that it does exist is a result of GCPM's "mistaken idea about what the universe of claims means in a Medicare post-payment audit." Id. The Secretary defines the universe of claims in a Medicare post-payment audit as a set of claims that meet certain criteria, and he argues that criteria which defines the universe "is an affirmative step to be taken by the [UPIC]." Id. at 2–3 (first citing Anghel v. Sebelius, 912 F. Supp. 2d 4, 11 (E.D.N.Y. 2012); and then citing MPIM § 8.4.1.3). The Secretary emphasizes that express language within the MPIM details that the universe only needs to include the full and partially paid claims that fall within the UPIC's definition and not those claims for which no payment was made. Id. at 3. He emphasizes that "reviewing courts have affirmed this reading." Id. In fact, the Secretary

---

[15] For GCPM's audit, the applicable Medicare program integrity contractor— which the court has been referring to as ZPIC—was AdvanceMed. In his declaration, D'Zio indicates that he works for the Southeastern Unified Program Integrity Contractor ("SE-UPIC") contract at SafeGuard Services ("SGS"). D'Zio Decl. ¶ 1. AdvanceMed was the incumbent SE-UPIC and the originator of the sample and overpayment extrapolation at issue in this case, but CMS and/or HHS awarded SGS the SE-UPIC contract in 2018 and AdvanceMed performed the customary transition of the workload to SGS at that time. Id. ¶ 6. To reiterate for clarity's sake, until 2016 ZPICs performed the same duties that UPICs now perform.

argues that GCPM "is apparently hypothesizing about a data file that [GCPM] might have <u>preferred</u> as the 'universe.'" <u>Id.</u> In essence, he contends that "[t]here is no 'Missing Universe File,'" and the only universe file ever defined and created for the GCPM audit is the Universe File and now also the Supplemental Universe File. <u>Id.</u> at 4.

Finally, the Secretary implies that GCPM did not, in good faith, meet and confer prior to filing this motion because GCPM expressed no dissatisfaction with and raised no challenge to the Secretary's submission of the universe file during the parties' May 15, 2024 telephone conference. <u>Id.</u> at 5. Secretary Becerra notes that GCPM sent him a draft of its motion for sanctions later that same day "solely for the purpose of asking whether the Secretary objected to the draft motion." <u>Id.</u> The Secretary argues that he has carried out the court's order comprehensively and in good faith such that the motion for sanctions should be denied. <u>Id.</u>

In reply, GCPM argues that the Secretary's response "inappropriately devotes much of its arguments to the merits of [GCPM's] appeal rather than the substance of [its] Motion for Sanctions." ECF No. 62 at 1. To the extent the Secretary's response focuses on GCPM's purported mischaracterization of what a universe entails, GCPM rebuts these arguments in its motion for summary judgment, response to the Secretary's motion for summary judgment, as well as in its reply brief to the Secretary's response in opposition. <u>Id.</u> (citing ECF Nos. 52; 56; 61). GCPM instead emphasizes that "the facts detailed in the administrative record clearly establish that the 'Missing Universe' . . . existed at the time of the agency's initial audit." <u>Id.</u> at 2. Given the Secretary's position that it has produced all the universe files with regards to the GCPM audit, GCPM argues that this shows that the Secretary "failed to preserve this evidence." <u>Id.</u> The Secretary's failure to

preserve and produce this evidence has prejudiced GCPM because "it prevented [GCPM] from being able to recreate the sampling frame and sampling process, which is needed to verify the contractor's calculations, and also to mount any due process challenge to the statistical validity of the sample and subsequent extrapolation." Id. at 3.

In response to the Secretary's claim of a phantom missing universe file, GCPM points to statements by AdvanceMed within the administrative record. Id. at 4 (citing Admin. R. 1 at 518–21). Those statements indicate that AdvanceMed voided sixteen zero-paid claim lines—which increased the error rate from 89.5% to 94%—and then extrapolated the higher error rate across the frame of all codes billed. Id. This evidence "clearly establishes" that a target universe existed at the time of the audit that included zero-paid claims because the OER indicates that (1) AdvanceMed created the sampling frame from a target universe that included zero-paid claims and that (2) AdvanceMed subsequently and deliberately filtered those claims out in drawing their sample for the audit. Id. In other words, the fact that the Secretary—by and through agency contractors—made no effort to preserve the target universe does not negate the fact that it existed and was in the contractors' possession at the time of the initial audit. Id. at 5. Moreover, D'Zio's declaration that no other universe file presently exists does not move the needle on this issue because he works at SGS, which is the UPIC that replaced AdvanceMed in 2018. Id. at 6 (referencing D'Zio Decl. ¶¶ 7–9). Moreover, D'Zio himself has no personal knowledge of how AdvanceMed pulled the claims data to create the sampling frame and perform the audit, how it excluded the zero-paid claims, or why AdvanceMed did not preserve the target universe. Id.

16

Finally, in reply to the Secretary's suggestion of GCPM's failure to meet and confer, GCPM observes that the Secretary incorrectly cites to Federal Rule of Civil Procedure 37(a)(1) instead of Federal Rule of Civil Procedure 37(b), which applies to this discovery dispute and does not require a meet and confer. Id. at 7. In any event, GCPM notes that it did meet and confer with the Secretary after his court-ordered production. Id. Additionally, the Secretary's repeated insistence that no other universe file exists— which GCPM takes to mean that no other universe file was preserved—meant that additional conferences or meetings prior to filing the instant motion for sanctions would have been futile. Id. at 7–8. GCPM's requested sanction is that the court find both that the target universe existed at the time of the initial audit and that the Secretary failed to preserve and produce this target universe. Id. at 8–9.

The court first reviews whether the Secretary failed to comply with this court's order to complete the administrative record before considering what sanctions, if any, would be appropriate for that failure.

### A. Failure to Obey an Order to Provide or Permit Discovery

Rule 37(b) authorizes the district court where an action is pending to impose appropriate sanctions when a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A); see R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 15 (1st Cir. 1991) ("The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before . . . sanctions can be imposed."). Several courts, including a court of appeals, have held that a prior court order to produce or complete an administrative record can be the basis for Rule 37 sanctions. See Diaz-

Fonseca v. Puerto Rico, 451 F.3d 13, 26 (1st Cir. 2006); see also State v. U.S. Dep't of Com., 461 F. Supp. 3d 80, 94 (S.D.N.Y. 2020) (concluding that, provided there is a clearly articulated order of the court required specified discovery including that the defendant produce the complete administrative record, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that order); Nat'l Urb. League v. Ross, 2020 WL 5548117, at *5 (N.D. Cal. Sept. 15, 2020) (noting that "failure to produce or complete an administrative record can be the basis for sanctions").

On May 17, 2024, the court granted GCPM's motion to compel completion of the administrative record, ECF No. 18, and directed Secretary Becerra to complete the administrative record with the Missing Universe File and the Adjusted OP File Calculations. ECF No. 43 at 25. The Secretary avers that no Missing Universe File exists, though he produced additional documentation for the sought Adjusted OP File Calculations on April 19, 2024. ECF No. 57 at 2. That production included a spreadsheet labeled "Copy of OP_Calculations_33A0000119456_ALJ" ("Recalculation Spreadsheet") and a PDF labeled "Overpayment Projection, ALJ *Goose Creek Physical Medicine 6575490001 WMM:33A0000119456*" ("Recalculation PDF"), which were new to GCPM. ECF No. 52-1 at 39. Importantly, the Recalculation Spreadsheet includes the information necessary to recreate and validate the recalculation, such that the Secretary met its burden to produce the Adjusted OP File Calculations. Id. With respect to the sought Missing Universe File, GCPM argues that, though it might not presently exist, the file previously existed, and the Secretary's failure to preserve that information or file as part of the administrative record should be sanctioned. ECF No. 62 at 5. GCPM's requested sanction is that the court establish as a fact that the target universe reflected in

18

the Missing Universe File existed at the time of the initial audit and that the Secretary failed to preserve and produce this target universe. <u>Id.</u> at 8–9.

To ensure all parties are on the same page, the court will provide some definitions. First, the "target universe" of a provider's Medicare claims consists of all adjudicated claims submitted by the provider during the period of review within the scope of the sampling unit, which typically covers all relevant claims or line items for the period under review. In this case, AdvanceMed indicated that the chosen time period was between March 5, 2011, and November 30, 2013. Admin. R. 1 at 516. AdvanceMed indicated that it "constructed a statistically valid random sample of claims for overpayment estimation" in that time period. <u>Id.</u> It then requested from GCPM "medical records associated with the sample of claims" and received those medical records on February 10, 2014. Admin. R. 1 at 517–18.

Second, once the sampling unit is selected, certain limiting criteria are applied to the target universe, and the resulting set of sampling unit data is called the "sampling frame." <u>See, e.g.</u>, Admin. R. 1 at 605 (defining the limiting criteria as "MSP excluded; Claims with paid amount > 0; carr_num ,<> '0082'; claim lines with hcpcs_cd in list*"). Thereafter a randomly selected number of claims are identified from the sampling frame, MPIM § 8.4.4, which AdvanceMed then reviewed pursuant to the following:

> Medical review for program integrity purposes was conducted on sixty-seven (67) claims and 210 CPT line items in the sample. The review resulted in a 89.5% (63 claims with 188 lines) denial rate. There was an allowed rate of 1.9% (2 claims with 4 lines) and a changed/down-coded rate of less than 1% (2 claims with 2 lines). It should be noted that 16 lines were voided as they constitute no loss to the Medicare Trust Fund.[16]

---

[16] These sixteen voided lines are the zero-paid claims which were removed from the sampling unit. It is unclear whether AdvanceMed also eliminated zero-paid claims from the target universe.

Admin. R. 1 at 518 (footnote added).  The contractor's medical review staff audits each claim or line item to determine whether the claim was properly paid, overpaid, underpaid, or improperly denied payment.  Upon completion of review of the sampled claims, the contractor calculates the net average amount by which the provider was incorrectly paid for the sampled claims.  In cases where the provider was initially overpaid, the net overpayment on the sample set is then projected to the sampling frame of that provider's claims to form the extrapolated overpayment amount.  AdvanceMed indicated that "statistical extrapolation was requested on all codes billed during the time period of March 5, 2011 through November 30, 2013" upon a finding that a sustained or high level of payment error exists.  Admin. R. 1 at 521.  AdvanceMed determined the error rate was 94% and subsequently determined that GCPM had been overpaid by Medicare in the amount of $337,693.90.  Id.

GCPM acknowledges receipt of the Universe File identified as "Attachment B – Universe.xlsx" which was a statistical methodology document that listed the fully and partially paid claim lines but which omitted all zero-paid claims.  ECF No. 43 at 14.  In contrast, the Missing Universe File is the document that did not omit the zero-paid claims, defined as fully adjudicated claims resulting in no payment to the provider.  Id. In other words, GCPM seeks the target universe, as defined above and inclusive of zero-paid claims.  ECF No. 53 at 1–2.  This information operates as inputs to the subsequent calculated overpayment, and the Secretary's failure to produce said information is a violation of the court's order to complete the administrative record and is therefore sanctionable pursuant to Rule 37(b).  See Diaz-Fonseca, 451 F.3d at 26.

### B. Sanctions

"Once a court makes the threshold determination under Rule 37(b)" that a prior discovery order has been violated, Thompson v. U.S. Dep't of Hous. & Urb. Dev., 219 F.R.D. 93, 102 (D. Md. 2003), subsection (b)(2)(A) "contains two standards—one general and one specific—that limit [the] court's discretion" in choosing what sanction(s) to impose, Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707 (1982).  "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." Ins. Corp. of Ir., 456 U.S. at 707 (citing Fed. R. Civ. P. 37(b)(2)(A)).  In making this determination, the district court should consider: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would . . . be[] effective."  S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003); see Beach Mart, Inc. v. L&L Wings, Inc., 784 F. App'x 118, 123–24 (4th Cir. 2019) (citing Fed. R. Civ. P. 37(b)(2)(A)). "Some sanctions, including an adverse inference, require the court to find that the disobedient party acted willfully or in bad faith."  Gilmore v. Jones, 2021 WL 5280970, at *6 (W.D. Va. Nov. 12, 2021) (citing Sampson v. City of Cambridge, 251 F.R.D. 172, 181 (D. Md. 2008)).

### 1. Bad Faith

A finding of bad faith is warranted when a party's actions "demonstrate[] a pattern of indifference and disrespect to the authority of the court," Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc., 872 F.2d 88, 93 (4th Cir. 1989), or evince

21

"'callous disregard' of the party's obligations under the Rules," <u>Wilson v. Volkswagen of Am., Inc.</u>, 561 F.2d 494, 504 (4th Cir. 1977). Mere "inability" to comply does not constitute bad faith. <u>Wilson</u>, 561 F.2d at 503; <u>see also</u> <u>Bizprolink, LLC v. Am. Online, Inc.</u>, 140 F. App'x 459, 463 (4th Cir. 2005). Rather, bad faith is the party's knowing disregard for its obligations to comply with court orders and/or the Federal Rules of Civil Procedure. <u>Rabb v. Amatex Corp.</u>, 769 F.2d 996, 999–1000 (4th Cir. 1985).

The appeals process for this dispute has dragged on for over a decade. AdvanceMed's initial audit was conducted in 2014. Therefore, the file(s) containing the target universe, as defined above, and the sampling unit inclusive of the zero-paid claims would have been created at that time. Based on a layman's understanding of math, this information constituted inputs to the eventual calculation of the overpayment such that, mathematically, they would have had to have existed in some form. SGS is the UPIC that took over AdvanceMed's workload and accepted the transfer of all related files sometime in 2018. D'Zio Decl. ¶ 6. The Secretary avers, based on SGS's representation, that these sought files do not exist today. ECF No. 57 at 4.

Rather than demonstrating a pattern of indifference and disrespect to the authority of the court, the failure to preserve the target universe inclusive of the removed zero-paid files is likely run-of-the-mill government negligence. <u>See</u> <u>Mut. Fed. Sav. & Loan Ass'n</u>, 872 F.2d at 93. Mere "inability" to comply does not constitute bad faith. <u>Wilson</u>, 561 F.2d at 503. At the hearing, GCPM confirmed that it is not alleging bad faith but rather agreed with the court's description of basic government negligence. ECF No. 65. Consequently, the court finds that the Secretary has not engaged in bad faith failure to comply, such that the sanctions should be less drastic.

### 2. Prejudice to GCPM

GCPM claims that it was prejudiced by the Secretary's failure to preserve

information on the target universe or the zero-paid claims. ECF No. 62 at 8. Namely,

GCPM contents that cannot recreate the sampling frame and sampling process without

this data. Id. Consequently, it cannot verify the contractor's calculations to test the

statistical validity of the sample and subsequent extrapolation. Id. The court agrees and

finds that the Secretary's failure to preserve that information prejudiced GCPM

throughout its appeals process, which weighs in favor of sanctions.

### 3. Need for Deterrence

"There is a need for deterrence in cases where a party has brought the case to a

significant standstill through failure to participate in discovery." Allen v. One Stop

Staffing, LLC, 2021 WL 5416530, at *5 (D. Md. Nov. 19, 2021) (quoting Doggett v. City

of Hyattsville, 2014 WL 6471748, at *4 (D. Md. Nov. 17, 2014)). The noncompliance in

this case is the Secretary's failure to preserve necessary information. That information

comprises essential inputs to the mathematical analysis at the crux of this litigation—

namely, whether the Secretary's overpayment determination was correct and whether the

failure to preserve that information violated GCPM's procedural due process rights. This

case's procedure posture is unique in that the Secretary failed to comply with the court's

order to complete the administrative record. ECF No. 43. Consequently, the case is not

at a standstill because of the Secretary's failure to participate in discovery, but the case is

nevertheless affected by the Secretary's failure to preserve the files necessary to

mathematically understand whether a due process violation has occurred. See Allen,

2021 WL 5416530, at *5.  The Secretary has otherwise complied with the court's orders and participated fully such that there is not a great need for deterrence.

### 4. Effectiveness of Less Drastic Sanctions

GCPM argues that its requested sanction is appropriate and limited in scope.  ECF No. 62 at 8–9.  Namely, GCPM solely seeks for the court to hold, as an established fact, both that the target universe existed at the time of the initial audit and that the Secretary failed to preserve and produce this target universe.[17]  Id.  GCPM does not seek attorney's fees, but merely seeks "to correct the record and refute [Secretary Becerra's] continued assertion that this target universe never existed."  Id. at 9.  The court is inclined to grant this request because it is probably the least drastic sanction.  See Fed. R. Civ. P. 37(b)(2)(A)(i) (detailing that the court may "direct[] that the matters embraced in the order or other designated facts be taken as established for the purposes of the action, as the prevailing party claims").

The court finds the requested minimal sanctions appropriate and proportional to the Secretary's failure to preserve and produce the target universe file to complete the administrative record.  The court holds the following two facts as established:

---

[17] At the hearing, the court directed GCPM to inform the court whether its requested sanction operates as an adverse inference.  ECF No. 65.  On July 22, 2024, GCPM informed the court that its requested sanction does not operate as an adverse inference.  That is because holding the two requested facts as established—that the target universe existed and that the Secretary failed to preserve it—does not require the court to additionally hold that the target universe contained information adverse to the Secretary.  Moreover, holding these two facts as established does not require the court to find in favor of GCPM's motion for summary judgment because the court would still need to determine whether the Secretary's failure to preserve the target universe violated GCPM's due process rights.  The court agrees and finds that the requested sanction is not an adverse inference.  See Gilmore, 2021 WL 5280970, at *6.

(1) That the "target universe," defined as all adjudicated claims submitted by the provider during the period of review within the scope of the sampling unit(s), which includes "zero-paid" claims, defined as fully adjudicated claims resulting in no payment to the provider, that existed at the time the audit was drawn from the Secretary's claims data; and

(2) That the Secretary, through AdvanceMed acting as the Secretary's agent within the course and scope of its contracted duties, failed to preserve and produce this "target universe."

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** the motion for sanctions.  It holds as established facts both that (1) the target universe as defined above previously existed and (2) that the Secretary, through its agent AdvanceMed, failed to preserve and produce the target universe.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 5, 2024**
**Charleston, South Carolina**

25